[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action, plaintiff, as administrator of the estate of Anita L. Dion, (hereinafter Anita), seeks an injunction restraining defendant, Connecticut Teachers' Retirement Board, from paying the proceeds of Anita's lump-sum retirement allowance to defendant Edward R. Merski, (hereinafter Merski), and also seeks a declaratory judgment that Anita's designation of Merski as her beneficiary is null and void and that the plaintiff is the lawful beneficiary of the retirement allowance. The grounds asserted for this relief are that Anita lacked the mental capacity to make the designation and that the designation was the product of the undue influence of Merski.
The facts are as follows: Anita, in 1984, was a 44 year old single female who had been a teacher in the Ellington school system for 22 years. Her closest relatives were her mother, Anna Mae Dion, in her seventies who lived in Willimantic, and her sister Joyce, two and a half years younger than Anita, who taught school on a military base in Europe. In 1984 Anita experienced some stress as a result of a new teaching assignment and came under the care of psychiatrist Dr. Bennett I. Enowitch. His evaluation of her in 1984 was: Adjustment Disorder, being a reaction to her change of academic responsibilities; "it is assumed the disturbance will eventually remit after the stress ceases . . . . The degree of impairment is moderate . . . I do not feel that there is any major psychiatric disturbance here. The prognosis should be excellent."
Dr. Enowitch continued to see Anita for treatment for CT Page 385 thirty-six visits. He observed she had a love/hate relationship with her mother and was jealous and resentful of her sister for teaching abroad and leaving Anita to care for her elderly and sick mother. Anita had a long term relationship of at least twelve years with Merski, characterized at times by quarrels and at times by happiness. In the middle of that relationship, she had a brief but intense affair with a truck driver. Merski was in his middle sixties and Anita looked upon him as both a father figure and a close friend.
Dr. Enowitch terminated his treatment of Anita in January, 1990 when she became involved with alcohol. His final diagnosis of her was borderline personality structure characterized by hysteria, self-punitive and compulsive behavior, inability to maintain close relationships, latent depression.
In January 1990 Amota was in trouble at the school because of unexplained absences. On February 5, 1990 Anita collapsed in her classroom; her speech was observed to be slurred and her breath smelled of alcohol. She so forcibly refused the help of ambulance attendants, she had to be restrained by a strait jacket in the process of her being taken to the emergency room of Rockville Hospital for psychiatric evaluation.
After that incident, the Ellington school superintendent told her she could not return to school unless she underwent treatment for alcoholism. She and Merski visited several facilities until they fixed on the Institute of Living. Anita voluntarily admitted herself on February 23, 1990. At first, she was uncooperative, and resisted treatment for alcohol and valium abuse. Merski visited her and supported her wish to sign herself out. When the medication she was given caused a reaction, Merski urged her not to take it. The Institute received a telephone call from a Dr. Lawlor who said Anita had told him of a suicide plan. Anita denied this, but Anita's mother was informed and instituted commitment proceedings. For some reason, the proceedings were not brought to fruition because Anita signed herself out on March 16, 1990 against medical advice. The Institute's records are equivocal as to her suicide probability.
Anita spent the weekend with Merski and returned to the Institution on Monday, March 19, 1990 on the urging of Merski and her sister Joyce that otherwise she would lose her teaching job. She was assigned to a chemical dependency treatment program which met on weekday mornings from 9.00 A.M. to 12:30 P.M. Psychological test on admission revealed "no evidence of a formal thought disorder; however, emerging depression and aggressive feelings compromise A's reality testing. At times of enduring stress manifestations of A's disorganization include CT Page 386 primary process thinking, persecutory fears, and a confabulized style of perceptual organization that defy reality principle. Asses. results should be evaluated with caution in terms of diagnostic impressions. However, assess. results are consistent with a diagnosis of Borderline Personality Disorder."
Anita refused to participate in group therapy at the Institute and was asked to leave the program. She promised to do better, but the afternoon of March 29, 1990, she called Merski to pick her up, and she left the Institute with him against medical advice. Her discharge diagnosis was: alcohol abuse, Benzadiozapine [Valium] dependence and Psychosis NOS (not Otherwise Specified).
Anita returned to her home in Vernon with Merski. She was calm, well-groomed and the couple got along well together. On April 2, 1990 Superintendent of Schools Joseph DeLucia wrote to Anita informing her that her withdrawal from the substance dependency program at the Institute left him no alternative other than to seek her termination as a teacher. On April 6, 1990 he formally informed her that a hearing would be held by the Ellington board of education on April 11, 1990 to consider termination of her teacher's contract. Anita called DeLucia, telling him she preferred to take early retirement than to face termination proceedings.
On April 10, 1990 Anita appeared at the board of education office with Merski to sign the early retirement papers. She was nicely dressed and appeared calm and in well control of herself. Both Merski and Judith Meek, the board secretary, testified she was not under the influence of alcohol or drugs. Meek informed Anita about early retirement and helped her fill out the forms. Anita understood what Meek was saying and responded rationally. Anita chose a retirement payment plan that provided her with the largest monthly allowance to which she was entitled. At one point Meek asked Anita whom she wanted to name as the contingent beneficiary of the unexpended portion of her retirement contributions, with interest, if she died before it was paid to her. This was the first time Anita was aware she had to make this choice. Anita turned to Merski, who had stood apart reading a magazine while Anita was working with Meek, and said to Merski, "Should I name you?"
Merski was surprised because he did not know up to then such an alternative existed. He said, "That is entirely up to you, Anita."
Anita then told Meek she wanted to designate Merski as her sole contingent beneficiary and under the column "relationship", identified him as a "close friend." CT Page 387
After that Anita and Merski lived together as a devoted couple. Merski ran most of the errands and did many of the household duties. Several times Anita wrote messages to Merski of endearment and gratitude. Her spirits were high; they went out to dinner often; as Merski described their relationship, "it was like being married." On June 23, 1990, Anita was found in the garage with the motor of her car running. She died on the way to the hospital.
Dr. Peter Zeman, a treating psychiatrist at the Institute, testified that when Anita was discharged on March 29, 1990 she suffered from major depression and borderline personality disorder; that that psychiatric condition would not have cleared up in ten days; that on April 10, 1990 Anita was susceptible to the influence of others such as Merski, upon whom she relied; and that Anita lacked the mental competence to designate Merski as the contingent beneficiary of her retirement allowance.
Dr. John Felber, a forensic psychiatrist called by Merski, testified that, based on the psychiatric records, depositions of witnesses and testimony at trial, Anita did not have a borderline personality disorder, was not psychotic, although addicted to alcohol and valium, had the mental capacity to execute the designation on April 10, 1990, and was not susceptible to undue influence at that time.
There are remarkably few Connecticut cases dealing with the mental capacity to make a contract. Cottrell v. Connecticut Bank Trust Co., 175 Conn. 257, 261 (1978) recognized that "in Connecticut a party may avoid certain contractual obligations on the ground that at the time they were entered into he or she was mentally incapacitated." Doolittle v. Upson, 138 Conn. 642, 645
(1952) observes that the competence to make a valid will may be less than to manage and transact business generally and that "some mental impairment could occur and still leave the testatrix with a sound mind within the definition of testamentary capacity. . . ."
Section 12 of the Restatement of Contracts Second, (19 states:
 (1) Not one can be bound by a contract who has no legal capacity to incur at least voidable contractual duties. Capacity to contract may be partial and its existence in respect of a particular transaction may depend upon the nature of the transaction or upon the circumstances. (Underlying added). CT Page 388
 (2) A natural person who manifests assent to a transaction has full capacity to incur contractual duties thereby unless he is
(a) under guardianship, or
(b) an infant, or
(c) mentally ill or defective, or
(d) intoxicated."
Section 15 of the Restatement of Contracts, supra, states:
 (1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect
 (a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or
 (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition." (underlining added).
The Restatement emphasizes at comment b. to Section 15 that when no guardian has been appointed "there is full contractual capacity in any case unless the mental illness or defect has affected the particular transaction . . . . Where a person has understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction in its result is one which a reasonably competent person might have made." (underlining added).
In this case, the court has weighed all the facts and the testimony or the psychiatrists. It concludes Anita was mentally disturbed in February and March 1990. She acted irrationally in not staying at the Institute and completing its substance dependency treatment program. But no evidence indicates she was so totally out of contact with reality to lack the capacity to make individual rational decisions. When she was faced with a termination proceeding, she acted rationally to take early retirement. On April 10, 1990 she understood the retirement forms she filled out with the help of Meek and the nature and consequence of the transaction. Her choice of Merski as the contingent beneficiary of her unexpended retirement allowance was one which a reasonably competent person might have made. CT Page 389 Merski had been her friend and lover for a long time, but particularly so the last year or so before April 10, 1990. He was a natural object of her beneficence. He was emotionally closer to her than Anita's mother, with whom she had a love-hate relationship, and her sister whom she resented for leaving the responsibility for their elderly and ill mother upon Anita. Thus, this court concludes that Anita had the mental capacity and was mentally competent when she designated Merski to receive her retirement allowance.
Undue influence, under Connecticut law, is "'exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.'" Reynolds v. Molitor, 184 Conn. 526, 528
(1981).
After a full recital of the facts, Dr. Zeman testified Anita, in her mental condition when she left the Institute on March 29 1990, was susceptible to undue influence. He was then asked whether or not Anita was in fact under the undue influence of Merski on April 10, 1990. An objection to this question was sustained because Dr. Zeman was not present when the designation was made on that day. However, the court allowed Dr. Zeman, as an offer of proof, to answer the question. Dr. Zeman testified Anita's mental condition made her susceptible to persons on whom she depended. Merski had influenced her to leave the hospital against medical advice which was not in her interest. Anita's mental condition was likely to continue for the ten days after she left the hospital, and, therefore, Merski unduly influenced Anita to designate him as her beneficiary.
Even if this court had allowed that testimony and even if it were now to consider it in determining the issue before it, the court would conclude Merski did not, in fact, exercise undue influence over Anita when she designated him as her contingent beneficiary. Neither Anita nor Merski knew Anita had to choose a beneficiary at that time. Anita asked Merski if she could choose him and he left it completely to her. The decision was Anita's and she freely made it.
The fact Anita may have been grateful to Merski for all he had done for her, the fact she even was dependent on him, the fact she chose him over her mother and sister do not add up to so destroying her free agency or so constraining her free will as to constitute undue influence.
Accordingly plaintiff failed to prove the claims made in his complaint for an injunction and declaratory judgment and judgment may enter for defendant, with costs. CT Page 390
R. SATTER STATE TRIAL REFEREE